FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

2016 JUL 27 P 3: 32

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

| | |
|---|---|
| **RICHARD H. DAVIS, JR.,** | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **NISSAN NORTH AMERICA, INC.,** | * |
| Defendant. | * |

Case No.: GJH-14-3166

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

This is a race discrimination and retaliation case brought by Plaintiff Richard H. Davis,

Jr., an African-American male, against his former employer, Nissan North America, Inc.

("Nissan"), for purported violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e-2 *et seq.* and 42 U.S.C. § 1981. Nissan's Motion for Summary Judgment, ECF No. 32,

came before the Court for a hearing on July 15, 2016.[1] For the reasons that follow, Nissan's

Motion for Summary Judgment is granted, and this action is dismissed.

**I.    BACKGROUND**[2]

Nissan is an automobile manufacturer that sells vehicles throughout the United States.

ECF No. 1 ¶ 4; ECF No. 15 ¶ 4. Davis was employed by Nissan beginning in 1996 and

continuing until his termination in August 2013. ECF No. 1 ¶ 10; ECF No. 15 ¶ 10; ECF No. 32-

---

[1] Following the hearing, the Court invited the parties to supplement the summary judgment record. The Court considers all of the evidence in the record in ruling on the present Motion. *See* ECF Nos. 32, 35, 36, 40 & 41.

[2] All facts are viewed in the light most favorable to the non-movant.

3 at 29.[3] Davis started in the company as a technical support specialist and was later promoted to

the position of dealer technical specialist ("DTS"). The obligations of a DTS include assisting in

resolving vehicle repairs that dealer technicians were unable to diagnose and repair; analyzing

dealer service department operations and providing constructive feedback to dealership

management and Nissan regional staff; performing incident investigations and preparing related

reports; conducting evaluations of customer "buy-back" vehicles when repairs were

unsatisfactory;[4] and acting as Nissan's representative in Better Business Bureau arbitrations and

"Lemon Law" cases.  ECF No. 32-3 at 33; ECF No. 32-4 at 3–4.

Between roughly 2009 and 2011, Davis worked as a DTS under the supervision of

Rhonda Calico. *See* ECF No. 35-5 at 14; ECF No. 40-1 at 2. In addition to Davis, Calico was

responsible for supervising six other DTS employees, all of whom were Caucasian. ECF No. 35-

5 at 3. According to Calico, Davis, who is African-American, ECF No. 32-3 at 3, was a

professional employee who had a good rapport with customers and colleagues, ECF No. 35-5 at

5. During her deposition, she could not recall Davis ever having attendance problems, nor did

she ever receive complaints from other employees or from Nissan dealers about him. *Id.* at 6.

Calico described Davis as a "star performer," whose work was comparable to or better than the

other DTS employees whom Calico supervised. *Id.* at 7. In her annual evaluations of Davis'

performance, Calico explained that Davis was "a skilled and seasoned professional" who

"displays and maintains an effective and consistent level of performance with results that meet

and sometimes exceed position expectations." ECF No. 35-6 at 2. She further explained that

Davis "display[ed] a thorough knowledge of technical aptitude." *Id.* at 3. In each category of her

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[4] A buy-back vehicle is one which Nissan repurchases after a consumer has filed a complaint under a state Lemon Law or arbitration procedure. ECF No. 35-5 at 12.

performance appraisal, Calico rated Davis' performance as meeting or exceeding Nissan's expectations. *Id.* at 2–3.

Throughout the course of his employment with Nissan, Davis received various letters recognizing and commending his work. *See* ECF No. 35-4 at 4–30. For instance, in November 2010, the Regional Vice President and Regional General Manager for the Northeast Region of Nissan wrote to Davis stating this his "efforts in the field have a significant impact on [Nissan's] customers and dealers alike" and that his "training and professionalism distinguish [the] franchise as truly Tier 1!" ECF No. 35-4 at 4.

In October 2011, Calico was demoted and Davis began reporting to a new supervisor, Cristin Adinolfi, who is Caucasian. ECF No. 35-7 at 4; ECF No. 40-1 at 3. Adinolfi took over the supervisory duties of the same DTS employees that Calico had previously supervised. ECF No. 35-7 at 9–10. Shortly after she began working as the DTS supervisor, Adinolfi and Calico met to discuss the performance of the DTS employees. Adinolfi recalled that Calico had a favorable view of the group as a whole, but could not recall any impressions Calico had of the individual employees. *Id.* at 27–28. Although Calico no longer had supervisory power over the DTS employees, in her new role, she maintained daily contact with the DTS team. *See* ECF No. 35-5 at 14; ECF No. 40-1 at 2–3. Additionally, although Calico reported to a different manager, Adinolfi oversaw Calico's day-to-day responsibilities, as well. ECF No. 40-1 at 4.

In one incident in November 2011, Adinolfi disciplined Davis for what she perceived to be an improper use of a corporate credit card.[5] *See* ECF No. 32-3 at 6–8. Davis had been out on personal leave in California and used his company card to put gas in a vehicle that he was

---

[5] Upon Nissan's Motion to Dismiss, ECF No. 7, the Court concluded that Davis' allegation respecting this incident could not form the basis of his Title VII claim because it was time-barred, ECF No. 13 at 2. Nevertheless, the Court explained that Davis could rely on this and other time-barred incidents as background evidence to support his timely claims. *Id.*

driving. *See id.* at 54. According to Davis, he was driving a buy-back vehicle for a fellow DTS, *Id.* at 54; *see also* ECF No. 35-7 at 33, thus, in his view, he was on a work assignment when he used his corporate card, despite the fact that he used it while on approved leave. *See* ECF No. 35-5 at 12–14; *see also* ECF No. 35-1 at 15. Adinolfi agreed that DTS employees are permitted to use the company credit card when putting fuel in a buy-back vehicle as long as it was being driven during the normal course of business, and she also agreed that it was possible for employees to do business work while out on approved leave. ECF No. 35-7 at 31, 34. Adinolfi contacted the manager in California, however, who had no knowledge of Davis being in California. *Id.* at 34. Adinolfi ultimately rejected Davis' expense report for that charge, as well as for other instances in which Davis made a fuel purchase on weekends. *See id.* at 44. Davis subsequently reimbursed Nissan for those fuel expenses. *Id.* at 42; *see also* ECF No. 32-3 at 9, 55.

Adinolfi then reported the fuel charge issues to a Nissan human resources representative and, on January 4, 2012, issued Davis a Final Written Warning, informing him that "[a]ny future actions by [him] during the balance of [his] employment that reflect substandard judgment, integrity concerns, violation of policy or behavior that would warrant corrective action will be grounds for immediate termination . . . ." ECF No. 32-3 at 54–55.[6] On January 8, 2012, Davis wrote a letter to Adinolfi explaining his position with respect to the credit card charges, specifically, that he was unaware of any Nissan policy preventing an employee from using a company card to pay for fuel put in a company vehicle on weekends. *Id.* at 56. He noted, however, that he was willing to "work as hard as [he] can to improve communication, provide feedback, and help [Adinolfi] bestow the best service that we can to Nissan and Nissan's

---

[6] Although the Final Written Warning is dated January 4, 2011, other evidence in the record indicates that the date was wrong and that it was in fact issued on January 4, 2012. ECF No. 32-3 at 7.

customers." *Id.* at 57. Shortly thereafter, however, Davis wrote an email to Adinolfi arguing that "[t]his hazardous and hostile series of events must be explained and stopped," though he did not indicate in that email that he believed he was being singled out because of his race. *Id.* at 58.

Adinolfi also accused Davis of not completing a work assignment in December 2011. On November 2, 2011, Adinolfi informed all of the DTS employees she supervised that they were required to visit certain Nissan dealers by December 2, 2011. ECF No. 35-8 at 4. Davis, however, was on his approved leave in California for part of that time, so Adinolfi granted him an extension to complete the dealer visits until December 22, 2011. ECF No. 35-7 at 45–46. In her deposition, Adinolfi testified that Davis did not complete the assignment, ECF No. 40-2 at 11, but in an email from Davis to Adinolfi dated December 22, 2011, Davis reported that he completed the necessary dealer visits, ECF No. 35-9 at 2.

In March or April of 2012, when Adinolfi was preparing to give annual performance reviews to the DTS employees, she spoke with Calico to get her input, considering that Calico had been the DTS supervisor for the first half of that fiscal year. ECF No. 35-7 at 16–17. Adinolfi recalled that Calico had a favorable view of Davis' performance, but Adinolfi had a different impression of the quality of his work and, among other issues, had concerns about Davis' time management. *Id.* at 27–28. Despite these perceived performance issues and the reported misuse of his corporate credit card, for the 2011 performance year, Adinolfi gave Davis a performance rating of 2.5, indicating that his performance "meets expectations." ECF No. 32-3 at 62. A rating of 1.75 or below is one that would result in an employee being placed on a 90-day performance improvement plan ("PIP"). *See* ECF No. 35-7 at 22; ECF No. 35-5 at 9. In that performance appraisal, Adinolfi commented:

> While [Davis] seems to be very knowledgeable about his job, the focus on complet[ing] tasks and closing the loop leaves room for improvement. [Davis] has

5

missed customer appointments or rescheduled appointment[s] frequently. He does not always communicate these changes in a timely manner to internal and external customers. [Davis] does not regularly provide feedback emails as requested. Manager also feels [Davis] does not always understand the importance of tasks/duties assigned. [Davis'] performance will be monitored closely during the next fiscal year.

ECF No. 32-3 at 62.

In August 2012, according to Adinolfi, Davis was late to a meeting with a customer at a dealership in Tysons Corner, Virginia. An employee of the dealership called Adinolfi to inquire about Davis' whereabouts, because, although Davis had confirmed the appointment, he was unreachable. Adinolfi attempted to contact Davis, as did other Nissan employees, to no avail, but Adinolfi eventually learned that he arrived late for the scheduled inspection. ECF No. 40-2 at 16–17; ECF No. 35-7 at 47; ECF No. 35-8 at 5. Then, in March 2013, Davis was instructed to inspect a vehicle owned by the general manager of one of Nissan's dealers who had complained that the vehicle smelled of mold after it had a water leak. Although Davis reported that he uncovered no issue, after the general manager complained that he felt his concerns were being dismissed, a second DTS was sent to inspect the vehicle and found evidence of mold. ECF No. 40-2 at 18–21, 27; ECF No. 35-8 at 5. Adinolfi, however, could not recall or confirm whether an inspection by an independent third party company verified that there was indeed mold or mildew in the vehicle. ECF No. 35-7 at 53.

When Adinolfi was completing her performance evaluation of Davis' work for the 2012 fiscal year, she did not consult with Calico, and she ultimately gave him a rating of 1.75, meaning that his performance was below expectations. ECF No. 32-3 at 82–83. Adinolfi placed Davis on a PIP in April 2013. *Id.* at 64–65.

According to the PIP, the issues on which Davis needed improvement included that he lacked appropriate time management, his written work was of substandard quality, and that he

6

engaged in "unprofessional and insolent behavior" toward Adinolfi. *Id.* at 64. The PIP required

that Davis meet with Adinolfi once per week, typically by telephone conference, to discuss

Davis' progress on the PIP objectives. *Id.* Davis was also required to provide a weekly summary

of his work, including a brief description of each dealer visit. *Id.* The PIP warned that Davis was

required to "demonstrate immediate and sustained improvement in the areas discussed [in the

PIP]" and that "[f]ailure to do so may result in further corrective action up to and including

termination of employment." *Id.*

Davis did not agree that he had any performance issues and refused to sign the PIP, but

he agreed to meet the expectations and engage in the plan for 90 days. *Id.* at 17, 65. During his

initial PIP meeting, Davis asked Adinolfi and her supervisor, Jun Watanabe, "[w]hy am I being

treated so much differently," though, again, he did not make any explicit reference to his or

anyone else's race as the basis for the allegedly different treatment. *See id.* at 17–18. Following

this meeting with Adinolfi and Watanabe, Davis met with the Divisional Vice President for the

Northeast Regional Office to discuss the PIP and stated that Adinolfi was "falsely accusing [him]

of things that are not true." *Id.* at 19.

During the course of Davis' PIP, the weekly meetings were attended by Adinolfi, Davis,

and Todd Zannacker, a former DTS who was slated to become the DTS supervisor beginning in

July 2013. *Id.* at 20–22; ECF No. 32-4 at 14. Although Adinolfi reported that Davis' first weekly

meeting under the PIP was productive, ECF No. 32-3 at 66, she testified that she did not see

substantial improvement in Davis' performance over the course of the full 90 days, ECF No. 32-

4 at 11–12. Specifically, Adinolfi did not believe that Davis satisfied one expectation of the

PIP—improving his attendance—when he missed one of the weekly teleconference meetings

because he mistakenly believed that it was scheduled a half an hour later than it was. ECF No.

7

35-7 at 69; *see also* ECF No. 32-3 at 68–69. Additionally, Zannacker expressed his concern that, at one weekly meeting, Davis appeared unprepared to represent Nissan's position at an arbitration hearing that was scheduled to begin approximately 15 minutes after the call concluded. ECF No. 32-3 at 25, 70–71; *see also* ECF No. 35-7 at 75; ECF No. 36-3 at 4. Even though the hearing ended in a favorable result for Nissan, ECF No. 35-11 at 3, Zannacker and Adinolfi agreed that Davis' unpreparedness reflected a deficiency in his job performance. ECF No. 35-7 at 77–78; ECF No. 36-3 at 4. During another PIP meeting in mid-July 2013, Zannacker concluded that Davis' performance was not improving when it appeared that Davis was unfamiliar with the service history for two vehicles that were on his schedule to be inspected that day, nor could he immediately recall the customers' names or the specific issues with the vehicles. *See* ECF No. 32-3 at 73; ECF No. 36-3 at 4. According to Zannacker, "Nissan expects a DTS to be educated about the customer, the vehicle's history, and to have a strategy for how to address any issues prior to meeting with the customer at the dealership." ECF No. 36-3 at 4.

Early in the course of the PIP, Zannacker and Adinolfi also learned that Davis was not up-to-date on certain training required of the DTS employees; specifically, he was not certified as a Nissan Master Technician. *See* ECF No. 32-3 at 24, 28, 70. Davis indicated that he only attended training that was specifically requested by management, but Zannacker explained to Davis during their meeting that DTS employees were expected to self-manage their required training. ECF No. 32-3 at 70. By the end of the PIP, Davis still had not completed the necessary certification training. *Id.* at 28.

At the final PIP conference, Adinolfi informed Davis that Nissan would review all of the information gathered over the course of the PIP and evaluate his performance over the full 90 days. *Id.* at 27; ECF No. 32-4 at 19–20. A representative from human resources who was on the

call, Edith Ballard, informed Davis that Nissan would be determining whether to continue his employment. ECF No. 32-4 at 20. Davis then sent a letter to Zannacker and Ballard detailing the ways in which he felt he was exceeding his job expectations as compared to his peers. ECF No. 35-11; *see also* ECF No. 40-5 at 15–16. For instance, Davis explained that, in addition to his own assignments, he was required to take over other employees' assignments. ECF No. 35-11 at 2. Davis also indicated that, although he was unprepared for one hearing, that conduct would never occur again and he emphasized that, despite his unpreparedness, the result of that hearing was favorable for Nissan. *Id.* at 3. Davis assured Zannacker and Ballard that he was "willing to listen and seriously accept [their] recommendations and use this knowledge [gained from the PIP] as a path to focus and shine light on [his] performance for improvement." *Id.* at 6. Davis was nevertheless terminated from his employment with Nissan on August 13, 2013. ECF No. 32-3 at 29.

At various times before his termination, Davis complained to Calico that he was being treated differently than other DTS employees managed by Adinolfi. *See* ECF No. 35-5 at 15–16. He also complained that he felt that he was working in a hostile work environment.[7] *Id.*; *see also* ECF No. 32-3 at 58. After Davis reported to Calico that Adinolfi was unhappy with his performance, Calico explained that Adinolfi was a different manager than she was, and, in an effort to assure him that he had not been singled out, informed him that Adinolfi had placed another employee on a PIP. ECF No. 36-1 at 7.

Indeed, another DTS employee, Carlos Ferreira, who is Caucasian, was placed on a PIP by Adinolfi the year before Davis. *See* ECF No. 32-3 at 31; ECF No. 32-4 at 8, 23. Ferreira had

---

[7] At some before Adinolfi became his supervisor, Davis also complained to Calico about an email sent to him by an employee at a particular Nissan dealership that Davis characterized as racist and sexist. *See* ECF No. 1-5; ECF No. 35-7 at 81. Adinolfi did not recall this incident being mentioned during the course of Davis' PIP. ECF No. 35-7 at 81. Additionally, this incident was one that the Court previously concluded could not form the basis of Davis' Complaint in this action because it was time-barred. ECF No. 13 at 2.

previously been placed on a PIP under Calico's supervision for missing appointments and "failed accomplishments," and Calico believed that Davis outperformed Ferreira.[8] ECF No. 35-5 at 7–8. At the end of his first PIP, Calico did not recommend that Ferreira be terminated. *Id.* at 8. Under Adinolfi's supervision, Ferreira had communication and attendance issues, *see* ECF No. 35-7 at 18, but Ferreira was not recommended for termination at the end of this second PIP because, according to Adinolfi, he "did a complete 180" and improved substantially over the course of his PIP. ECF No. 32-4 at 15; *see also* ECF No. 40-1 at 5. Ferriera continues to work for Nissan. ECF No. 35-7 at 74.

After Davis' termination from Nissan, Calico and another Nissan employee, Les Yee, both agreed to write a letter of recommendation on Davis' behalf. ECF No. 35-4 at 2–3. In Calico's letter, she indicated that Davis "has great aptitude for research and discovery"; that he "embraces continuous learning"; that he "has a keen interest in his chosen field of automative technology and is skillful at time management"; and that he "would be an asset to any organization." *Id.* at 2. Yee, Nissan's Fixed Operations Manager for the Northeast region, explained: "[Nissan] dealers and I have found [Davis] to be competent in resolving difficult issues" and that Davis "has been responsive not only to me but to all of the many dealership technicians and service managers that would constantly call him on his mobile telephone." *Id.* at 3. In September 2013, Davis received a letter from John Spoon, the Vice President of the Nissan Parts & Service Division—but addressed simply to a "DTS Team Member"—thanking him for his efforts training Infiniti technicians on how to update software and enable the start of new sales, and noting that that there were "great reports regarding [his] professionalism throughout." *Id.* at 13.

---

[8] When she first took over as supervisor, Adinolfi agreed that Davis was outperforming Ferreira. ECF No. 40-2 at 5.

Davis filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 27, 2013. ECF No. 1 ¶ 66; ECF No. 32-2. The EEOC issued a right-to-sue notice on July 11, 2014. ECF No. 1-6. Davis then initiated the present action in this Court on October 8, 2014. ECF No. 1. Nissan moved to dismiss certain allegations in the Complaint on the ground that they were time-barred, ECF No. 7, and the Court granted that motion on January 28, 2015, ECF No. 13. Following discovery, Nissan filed the presently-pending Motion for Summary Judgment. ECF No. 32.

## II.   STANDARD OF REVIEW

"Under Rule 56(c) [of the Federal Rules of Civil Procedure], summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 322; *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir.2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring

the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477

U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769

F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not

simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent

'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys*

*Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 324–25). When ruling on

a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION

### A.  Disparate Treatment

In Count I of his Complaint, Davis claims that Nissan discriminated against him on the

basis of his race.[9] Title VII makes it illegal for an employer "to discharge any individual or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. §

2000e-2(a)(1). "A plaintiff generally may defeat summary judgment and establish a claim for

race discrimination [under Title VII] through two avenues of proof." *Holland v. Washington*

*Homes, Inc.*, 487 F. 3d 208, 213 (4th Cir. 2007). One avenue is for the plaintiff to demonstrate

"through direct or circumstantial evidence that his race was a motivating factor in the employer's

adverse employment action." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F. 3d

277, 284 (4th Cir. 2004) (en banc)). Alternatively, the plaintiff may proceed under the familiar

---

[9] Davis raises claims under both Title VII and § 1981. "Where, as here, a plaintiff presents circumstantial evidence of race discrimination, the elements required to show a viable cause of action are the same for both Title VII and § 1981." *Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 862 n.9 (D. Md. 2004) (citing *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004); *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363 (1989)).

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.

Ct. 1817 (1973).

Here, Davis has chosen to prove his case through the *McDonnell Douglas* burden-shifting

framework. *See* ECF No. 35-1 at 11–17. Under this approach, the plaintiff has the initial burden

of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *See*

*McDonnell Douglas*, 411 U.S. at 802; *see also Evans v. Tech. Applications & Serv. Co.*, 80 F.3d

954, 959 (4th Cir. 1996). Notably, the United States Supreme Court has indicated that a

plaintiff's burden to establish his *prima facie* case is not intended to be onerous. *See Tex. Dep't*

*of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089 (1981). If the plaintiff establishes

a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate,

nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff must

then prove by a preponderance of the evidence that the legitimate reasons offered by the

defendant are but a pretext for discrimination, thus creating an inference that the defendant acted

with discriminatory intent. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143,

120 S. Ct. 2097 (2000). If the plaintiff cannot produce evidence demonstrating the falsity of the

defendant's proffered reasons, the defendant is entitled to summary judgment. *See Diamond v.*

*Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 320 (4th Cir. 2005). Importantly, "[t]he plaintiff

always bears the ultimate burden of proving that the employer intentionally discriminated against

[him]." *Evans*, 80 F.3d at 959.

In order to demonstrate a *prima facie* case of race discrimination, a plaintiff must show

that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3)

he was performing at a level that met his employer's legitimate expectations at the time of the

adverse employment action; and (4) the position remained open or was filled by similarly

13

qualified applicants outside the protected class. *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (quoting *Hill*, 354 F.3d at 285).

The central dispute in this case involves the third element of Davis' *prima facie* case, *i.e.*, whether he was performing at a level that met Nissan's legitimate expectations at the time of his termination, and whether Nissan's proffered nondiscriminatory reason for Davis' termination—that his performance was not up to par—is pretextual.[10] Because Nissan's stated reason for terminating Davis was poor work performance, the evidence with respect to these two issues overlaps, and the Court will accordingly consider them together. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006) (noting the flexibility of the *McDonnell Douglas* framework and finding "no impermeable barrier that prevents the employer's use of such evidence [of an employee's unsatisfactory work performance] at different stages of the

_____

[10] The Parties also disputed in their written submissions whether Davis has established the final element of his *prima facie* case, but, with respect to that dispute, both Parties assumed that the final element to be considered is whether the employer treated similarly situated employees outside of a plaintiff's protected class more favorably than the plaintiff. *See* ECF No. 32-1 at 10; ECF No. 35-1 at 12. That assumption is not unreasonable considering that the United States Court of Appeals for the Fourth Circuit has appeared to apply that standard, without much explanation, in some cases where a plaintiff was terminated from employment for allegedly discriminatory reasons. *See Goode v. Cent. Virginia Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327 (2012). If this standard were to apply in this case, Davis could not satisfy his burden on this element. Although he argues that Ferreira, a Caucasian man, received more favorable treatment because he, too, was placed on a PIP but ultimately was not terminated, ECF No. 35-1 at 14, Davis has not submitted any evidence to dispute Adinolfi's testimony that, contrary to Davis' performance over the course of his PIP, Ferreira "did a complete 180." ECF No. 32-4 at 15. But in *Miles v. Dell, Inc.*, the Fourth Circuit noted that when a Title VII plaintiff has been terminated from his employment, "[i]t is . . . clear that the law in this circuit is that, as a general rule, Title VII plaintiffs must show that they were replaced by someone outside their protected class in order to make out a *prima facie* case." 429 F.3d 480, 486 (4th Cir. 2005). In more recent cases, the Fourth Circuit has broadly described the final element of the *prima facie* case as requiring that a plaintiff show that the adverse employment action "occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Collins v. Balt. City Bd. of Sch. Comm'rs*, 528 F. App'x 269, 272 (4th Cir. 2013) (quoting *Burdine*, 450 U.S. at 253). But "[u]sually, a plaintiff does so by showing that she was replaced by an individual outside her protected class." *Id.* (citing *Miles*, 429 F.3d at 486 ); *see also Addison v. CMH Homes, Inc.*, 47 F. Supp. 3d 404, 419 (D.S.C. 2014) (citing comparison to "similarly situated employees" as standard for final element of *prima facie* case, but noting that "[c]ourts use a more specific *prima facie* test in connection with a claim of disparate treatment based upon a discharge" requiring proof that plaintiff's position remained open or was filled by an individual outside the protected class). During oral argument on the present Motion, the Parties agreed that Davis was replaced by a Caucasian, ECF No. 39 at 41, 57, but neither party has pointed to any evidence in the record supporting that fact. That lack of evidence is of no moment in the present case, however, because the Court ultimately determines that dismissal is warranted for other reasons, and will simply assume, without deciding, that Davis can satisfy the final element of his *prima facie* case.

*McDonnell Douglas* framework"); *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106,

1113 (7th Cir. 1998) (noting that there is "a great deal of overlap" with respect to the factual

inquiry regarding whether an employee was fulfilling the legitimate performance expectations of

the employer and whether the reasons given by the employer for the discharge are pretextual).

To demonstrate at the summary judgment stage that an employee was meeting his

employer's performance expectations, a plaintiff must "demonstrate that he was generally

satisfying his employer's relevant, objective performance standards at the time of his

termination." *Brown v. Siemens Healthcare Diagnostics, Inc.*, No. DKC-11-0769, 2012 WL

3136457, at *7 (D. Md. July 31, 2012) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d

761, 766 & n.1 (4th Cir. 2003)). "'[A] plaintiff need not show perfect performance or even

average performance to satisfy this element. He need only show that his performance was of

sufficient quality to merit continued employment, thereby raising an inference that some other

factor was involved in the decision to discharge him.'" *Id.* (quoting *Powell v. Syracuse Univ.*,

580 F.2d 1150, 1155 (2d Cir. 1978)). A plaintiff can meet his burden of proving pretext "either

by showing that [the employer's] explanation [for his termination] is 'unworthy of credence' or

by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination."

*Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (citing *Burdine*, 450 U.S. at 256; *Dugan v.*

*Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002)).

In arguing that he was meeting Nissan's legitimate job expectations at the time he was

terminated, Davis relies principally on Calico's assessment of his work. *See* ECF No. 35-1 at 13–

14. Although Calico was no longer his supervisor at the time of his PIP or termination, Davis

points to evidence indicating that Calico maintained daily interaction with him after Adinolfi

took over as his supervisor, and that she did not receive any complaints about his work during

that time. ECF No. 35-5 at 14; ECF No. 36-1 at 6. Additionally, after his termination, Calico

provided Davis with a letter of recommendation for future employment, noting that Davis

"would be an asset to any organization." ECF No. 35-4 at 2. Davis also points to other

"endorsement letters" he received praising his work, *see* ECF No. 35-4, and argues that this

evidence demonstrates that he "satisfied all the allegations in the PIP." ECF No. 35-1 at 16.

Many courts, including this one, have held that the opinion of prior supervisors does "not

suffice to prove . . . a *prima facie* case because acceptable job performance in the past does not

establish acceptable job performance at the time of the termination," *Diamond v. Bea Maurer,*

*Inc.*, 128 F. App'x 968, 973 (4th Cir. 2005), and that "[i]t is the perception of the decision maker

which is relevant" when determining whether a plaintiff has met his burden on this element,

*McZeke v. Horry Cty.*, 609 F. App'x 140, 144 (4th Cir. 2015) (citation and internal quotation

marks omitted); *see also Mabry v. Capital One, N.A.*, No. GJH-13-02059, 2014 WL 6875791, at

*4 (D. Md. Dec. 3, 2014) (noting that prior supervisor's assessment of plaintiff's performance

seven months before she was terminated was "irrelevant to her *prima facie* case"). The Fourth

Circuit has also explained that "[t]he alleged opinions of [a plaintiff's] co-workers as to the

quality of [his] work are . . . 'close to irrelevant'" in determining whether a plaintiff was

satisfying his employer's job expectations. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir.

2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Nonetheless,

courts should hesitate to rely solely on the stated view of the alleged discriminator, the decision-

marker, in dismissing a Title VII claim. Indeed, the *McDonnell Douglas* framework was

formulated because "it is rare that a decision-maker will admit to discriminating and it is

impossible to get inside the decision-maker's mind." *Glover v. Williamsburg Local Sch. Dist. Bd.*

*of Educ.*, 20 F. Supp. 2d 1160, 1174 (S.D. Ohio 1998); *see also Merritt v. Old Dominion Freight*

*Line, Inc.*, 601 F.3d 289, 299–300 (4th Cir. 2010) ("A plaintiff does not need a 'smoking gun' to prove invidious intent, and few plaintiffs will have one.").

Here, however, Davis has not submitted evidence creating a genuine dispute with respect to whether he was meeting Nissan's legitimate expectations at the time of his termination, and whether Nissan's stated reason for his termination was therefore pretext for discriminatory animus. *See Anderson*, 477 U.S. at 248 (a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Although Calico indeed had positive reviews of Davis' performance while she was his supervisor, once Adinolfi took over, Calico was no longer involved in evaluating Davis' performance, nor did she see Davis' written work. ECF No. 36-1 at 6; ECF No. 36-2 at 4. Her ability to accurately assess whether Davis' performance continued to be satisfactory was limited. Calico also testified at her deposition that she explained to Davis that Adinolfi was "a very different manager with different expectations" and that she did not think that Adinolfi was singling Davis out because she also was addressing performance issues with other DTS employees. ECF No. 36-1 at 7; *see also Avant v. S. Maryland Hosp.*, Inc., No. GJH-13-02989, 2015 WL 435011, at *6 (D. Md. Feb. 2, 2015) (citations and internal quotation marks omitted) ("[D]ifferent supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important[.]"). Importantly, with respect to the letters of endorsement that Davis received from other individuals at Nissan, Davis has not submitted any evidence from which the Court could determine to what extent those individuals were knowledgeable of the quality of his work. *See* ECF No. 35-4; *see also DeJarnette*, 133 F.3d at 299 n.3 (conclusion that coworkers' opinion testimony was "substantially irrelevant" was "buttressed by the coworkers' concessions . . . that they rarely observed [the plaintiff] and that

they were unable to observe [the plaintiff] as often as [her direct supervisor] observed her"). Indeed, one letter submitted in support of Davis' argument is dated after his termination and addressed only to a "DTS Team Member." ECF No. 35-4 at 25.

Moreover, the record is replete with documentation demonstrating Davis' lack of progress throughout the course of the PIP. *See* ECF No. 32-3 at 66–81. In April 2013, after Davis had multiple performance issues, *see* ECF No. 35-8 at 5, Adinolfi's placed him on a PIP. *See* ECF No. 32-3 at 64–65. Throughout the course of the PIP, Adinolfi and Zannacker agreed that Davis was not improving. *See* ECF No. 32-4 at 11–12; ECF No. 36-3 at 4. Both had concerns with the fact that Davis appeared unprepared for an arbitration hearing that was scheduled to begin shortly after one of their weekly meetings, and, after he had been on the PIP for nearly three months, he appeared unprepared to resolve customer concerns related to two vehicles that were on his schedule for the day of another PIP meeting. ECF No. 32-3 at 70–71; ECF No. 32-4 at 15–16; ECF No. 36-3 at 4. Moreover, Davis had failed to stay up-to-date on required DTS training certifications, and, despite being informed during the PIP that he was required to self-monitor that certification process, he failed to complete his missing certification training by the end of the PIP. *See* ECF No. 32-3 at 24, 28, 70.

Davis, however, contends that his performance over the course of the PIP was not the true reason for his termination because Adinolfi wanted to fire him before she placed him on the PIP. *See* ECF No. 35-1 at 15. Specifically, Davis argues that Adinolfi indicated that he was "one-step away from termination" when he allegedly violated the Nissan expense and reimbursement policy for his use of the corporate credit card while he was on leave in California. *Id.*; *see also* ECF No. 35-7 at 43. He further points to the fact that he was falsely accused of not completing an assignment by the required deadline in December 2011. *See* ECF No. 35-8 at 4–5. Even

assuming these incidents prove, as Davis argues, that Adinolfi was inclined to fire Davis "and simply gathered evidence to build her case," ECF No. 35-1 at 15, it does not establish that Nissan's reason for terminating his employment was mere pretext for racial discrimination. Indeed, in order to demonstrate pretext, a plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason" for the adverse employment action. *Adams v. Tr. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (emphasis in original) (citation omitted); *see also Sellers v. Giant Cement Holding, Inc.*, No. 11-2803, 2013 WL 4436470, at *3 (D.S.C. Aug. 14, 2013) ("'[B]uilding cases' against under-performing employees does not demonstrate a discriminatory animus. Indeed, in many race discrimination cases . . . the Plaintiff advances the exact opposite argument; that is, that there were no warnings made along the way, thereby giving rise to an inference of racial discrimination. . . . [W]ell-documented warnings and reprimands issued to the Plaintiff are not proof of pretext."). Because Davis has not pointed to any circumstantial evidence probative of discrimination, nor pointed to evidence establishing that Nissan's reason for his termination is "unworthy of credence," *Mereish*, 359 F.3d at 336 (citation and internal quotation marks omitted), Nissan is entitled to summary judgment on Count I of Davis' Complaint.

### B. Retaliation

In Count II of the Complaint, Davis asserts a claim of retaliation against Nissan in violation of Title VII and § 1981. Like claims of race discrimination, a plaintiff may prove his claim of retaliation using the *McDonnell Douglas* burden-shifting framework. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds by Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). A *prima facie* case of retaliation requires proof that "'(1) [the plaintiff] engaged in protected activity, (2) he suffered an adverse employment

action at the hands of [his employer]; and (3) [the employer] took the adverse action because of

the protected activity.'" *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543 (4th Cir.

2003) (quoting *Spriggs*, 242 F.3d at 190); *see also* 42 U.S.C. § 2000e-3(a) (prohibiting

discrimination against employee in retaliation for employee's opposing illegal discrimination

practices or participating in Title VII enforcement proceedings). Once the plaintiff establishes a

*prima facie* case, the employer can defend itself by producing "evidence of a legitimate, non-

discriminatory reason for taking the adverse employment action." *Bryant*, 333 F.3d at 543

(citation and internal quotation marks omitted). If the employer meets this burden, the burden

shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated

reasons were not its true reasons, but were in fact a pretext for retaliation. *See Hoyle v.

Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).

     Here, even assuming Davis could establish a *prima facie* case of retaliation, Davis' claim

ultimately fails for the same reasons previously discussed with respect to his claim of race

discrimination, namely, that Davis has failed to submit any evidence demonstrating that Nissan's

legitimate nondiscriminatory reason for terminating him was pretextual.[11] *See Roberts v. Saint

Agnes Hosp.*, No. GJH-13-3475, 2015 WL 3932398, at *11 (D. Md. June 25, 2015), *aff'd sub

nom. Roberts v. Saint Agnes Hosp./Ascension Health*, 622 F. App'x 255 (4th Cir. 2015) (granting

employer's motion for summary judgment on retaliation claim where plaintiff's termination

"was the result of his lengthy and well-documented performance deficiencies" and plaintiff

"failed to adduce any admissible evidence to suggest a connection between his complaints about

alleged workplace discrimination and his eventual termination"). Nissan is therefore entitled to

summary judgment on Count II of Davis' Complaint.

---

[11] In light of this conclusion, the Court need not determine whether Davis' complaints that Adinolfi's conduct was "hazardous and hostile," *see* ECF No. 32-3 at 58, or that he was suffering from a hostile work environment, constituted protected activity, despite the fact that Davis did not specifically mention his race in his complaints.

## IV.    CONCLUSION

For the foregoing reasons, Nissan's Motion for Summary Judgment, ECF No. 32, is

**GRANTED**, and this action is **DISMISSED** with prejudice. A separate Order follows.


Dated: July ____ , 2016

_____
GEORGE J. HAZEL
United States District Judge